IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. _____

RUSTYGATE VENTURES, LLC, a
Florida limited liability company,
d/b/a M. Performance Wellness Recovery,

        Plaintiff,

vs.

CRYO SCIENCE NORTH AMERICA, INC.,
a Pennsylvania corporation,

        Defendant.

_____/

## COMPLAINT

Plaintiff RUSTYGATE VENTURES, LLC, d/b/a "m. Performance Wellness Recovery" ("M. Performance"), through undersigned counsel, sues Defendant CRYO SCIENCE NORTH AMERICA, INC. ("Cryo Science"), and alleges as follows:

## INTRODUCTION

1.     This is an action in which M. Performance seeks to recover from Cryo Science, not only the monies it spent on purchasing a defective cryotherapy machine known as the "CRYO Glacier" ("Glacier") manufactured by Cryo Science, but also for business losses suffered as a result of the Glacier's inoperability for approximately 40% - 50% of its lifetime since its installation, nearly causing M. Performance to close its doors.

## PARTIES

2.     Rustygate Ventures, LLC, d/b/a M. Performance Wellness Recovery, is a Florida limited liability company, organized in Florida, with its corporate address at 9029 Spring Mountain Way, Fort Myers, Florida 33908, and its principal place of business in Fort Myers, Florida.

3.     Rustygate Ventures, through M. Performance, offers various health, performance, wellness and recovery services, such as Red Light therapy, compression therapy, infrared sauna, and cryotherapy.

4.     Cryo Science is a Pennsylvania corporation with its principal place of business located at 615 Front Street, Suite 103, Whitehall, Pennsylvania 18052.

5.     Upon information and belief, Cryo Science manufactures and offers for sale to wellness companies like M. Performance the Glacier, which is manufactured by its manufacturing arm located in Poland and/or Fullerton, Pennsylvania, or elsewhere.

6.     Cryo Science touts itself on the internet as "the leading innovator and manufacturer of cryotherapy solutions."

## JURISDICTION AND VENUE

7.     Jurisdiction in this Court is proper and based upon diversity of the Parties pursuant to 28 U.S.C. § 1332(c)(1), as both M. Performance and Cryo Science are citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest, fees and costs.

8.     M. Performance has two members, Todd Schulz, and Angie Ferguson, each of whom is a citizen of the State of Florida.

9.     Cryo Science is a Pennsylvania corporation with its principal place of business located at 615 Front Street, Suite 103, Whitehall, Pennsylvania 18052.

2

10.   This Court has personal jurisdiction over the Defendant pursuant to Florida Statutes, section 48.193(1)(a).

11.   The Defendant conducts business in Florida.

12.   The Defendant advertises the sale of its products via the Internet in Florida to Florida residents.

13.   The Defendant engages in the solicitation of business to Florida residents.

14.   The Defendant, through its authorized representative[s], negotiated for the sale of its product at issue in this lawsuit to the Plaintiff, a Florida corporation located in Fort Myers, Florida.

15.   The Defendant sold the defective machine at issue in this lawsuit, which was used by the Plaintiff in its business located in Fort Myers, Florida.

16.   The Defendant installed the defective machine in M. Performance's location in Florida.

17.   The Defendant has continuing contractual warranty obligations to the Plaintiff, a Florida corporation located in Fort Myers, Florida, and breached such obligations.

18.   The defective machine sold by the Defendant to the Plaintiff was used by the Plaintiff in Fort Myers, Florida, in the ordinary course of commerce.

19.   The Defendant communicated repeatedly with M. Performance, dispatched or arranged technicians to Florida, and should reasonably anticipate being haled into a Florida court.

20.   Venue is proper in this court pursuant to 28 U.S.C. § 1391(b), as a substantial portion of the events alleged herein occurred in Lee County, Florida, including installation, use, failure, warranty communications, repair attempts, and business losses.

3

## DAMAGES

21.     Although the extent of all damages incurred by M. Performance has not been fully calculated, some of the company's damages are discussed below.

22.     M. Performance purchased the Glacier for $115,000.00 plus sales tax, a piece of equipment that does not work and has been taken out of use.

23.     Based upon operational problems with the Glacier after installation, and upon the advice of Cryo Science, M. Performance purchased a dehumidifier for $3,800.00.

24.     Although the Glacier has been taken out of service, M. Performance continues to pay its monthly financing charge for the Glacier in the amount of $4,243.82, to Brickhouse Capital.

25.     Additionally, M. Performance is now storing the Glacier at a storage facility at the cost of $224.75 per month, beginning March 2026.

26.     Because Cryo Science refused to replace the Glacier with a new machine, and because trying to fix the machine was no longer an option because it could not be fixed, M. Performance was forced to go back into the marketplace and purchase a brand-new machine, the Mecotec CryoOne+ by Mecotec, at an out-of-pocket cost of $123,255.92.

27.     Additionally, M. Performance paid $7,500.00 for installation charges related to the installation of the new Mecotec CryoOne+.

28.     Because the Glacier was inoperable for at least 40% of the time, M. Performance suffered damages in the form of lost revenue.

29.     Interestingly, Cryo Science had its own "Revenue Calculator" that potential customers could review and use to calculate the profits they could expect by purchasing the Glacier.

4

| | CASUAL | DEVELOPING | IDEAL | OPTIMAL | MAXIMUM |
|---|---|---|---|---|---|
| Days operating per week | 4 | 5 | 6 | 6 | 7 |
| Hours per day | 4 | 5 | 6 | 8 | 10 |
| Sessions per hour | 3 | 3 | 4 | 6 | 10 |
| Total sessions per week | 48 | 75 | 144 | 288 | 700 |
| Profit per session | $199 | $199 | $199 | $199 | $199 |
| Profit per week | $9,552 | $14,925 | $28,656 | $57,312 | $139,300 |
| Profit per year | $496,704 | $776,100 | $1,490,112 | $2,980,224 | $7,243,600 |

| INVESTMENT | PROFIT / SESSION | PROFIT / HOUR | BREAK EVEN |
|---|---|---|---|
| $295,000AUD | $199 / 3 min | $1,194 (6 sessions) | 247 hours |

30.     Using Cryo Science's own Revenue Calculator and figures, M. Performance is calculating its minimum lost revenues based upon an estimated downtime of Forty-Two Percent (42%), resulting in a weekly revenue loss of at least $8,748.00, or $102,876.48.

**CRYOSCIENCE REVENUE CALCULATOR**
- AUD TO USD CONVERSION $1.42
- M.PWR ACTUAL DATA TO DETERMINE $$
- ESTIMATE DOWNTIME = 42%

| | Cryo Science CASUAL | CRYOSCIENCE DEVELOPING | m.PWR ACTUAL | CRYOSCIENCE IDEAL | CRYOSCIENCE OPTIMAL | CRYOSCIENCE MAXIMUM |
|---|---|---|---|---|---|---|
| Days per week | 4 | 5 | 6 | 6 | 6 | 7 |
| Hours per Day | 4 | 5 | 9 | 6 | 8 | 10 |
| Sessions per Hour | 3 | 3 | 3 | 4 | 6 | 10 |
| sessions per Day | 12 | 15 | 27 | 24 | 48 | 100 |
| Sessions per week | 48 | 75 | 162 | 144 | 288 | 700 |
| REVENUE per Session | $140 | $140 | $54 | $140 | $140 | $140 |
| REVENUE per week | $6,720 | $10,500 | $8,748 | $20,160 | $40,320 | $98,000 |
| REVENUE per year | $349,440 | $546,000 | $454,896 | $1,048,320 | $2,096,640 | $5,096,000 |
| # Weeks SINCE OPENING | 52 | 52 | 28 | 52 | 52 | 52 |
| Total Profit | | | $244,944 | | | |
| mPWR Downtime (-42%) | | | 11.76 | | | |
| LOST REVENUES | | | $102,876.48 | | | |

31.     M. Performance has also spent approximately $40,000 on a marketing program to try and rebuild trust with its clients, as well as potential clients, in the community.

32.     Unfortunately, M. Performance became somewhat of a joke in the Fort Myers community as it was a brand new wellness center with a cryotherapy machine, designed to be the business' centerpiece, that didn't work between 40-50% of the time.

33.     As a result, M. Performance stopped promoting its cryotherapy offering.

34.     While M. Performance is still calculating its damages, they are expected to be in excess of $600,000.00.

5

## FACTUAL ALLEGATIONS

*Cryotherapy*

35. On August 2, 2025, M. Performance opened its doors to the general public, offering to clients various health, performance, wellness and recovery services.

36. One such service offered by M. Performance to its clients is cryotherapy.

37. M. Performance's cryotherapy was offered as the centerpiece of its business model, and would be the main factor in driving foot traffic into the business.

38. Cryotherapy is the science of exposing the body to sub-zero temperatures of up to -140°C/-220°F in order to stimulate multiple wellness benefits.

39. Essentially, cryotherapy works by safely lowering a person's skin temperature which induces relaxation and a number of other wellness benefits.

40. In order to obtain the benefits of M. Performance's cryotherapy treatment, its clients enter a sealed cryo-chamber, in which they are exposed and subjected to cryogenically cooled air, sometimes as low as -140°C/-220°F, for a maximum period of three minutes.

41. Exposure to this cooled air provides a number of potential benefits, including reduced inflammation and pain, faster muscle recovery for athletes, improved circulation, mood elevation and stress reduction.

*The Glacier*

42. Knowing of the popularity of cryotherapy, M. Performance looked to acquire a cutting-edge cryo chamber for its business that would set it above and apart from its local competitors.

43. After much research, M. Performance settled on purchasing a cryo chamber from Cryo Science.

6

44. M. Performance purchased the Glacier directly from Cryo Science through an Equipment Financing Agreement with Brickhouse Capital.

45. Cryo Science touts itself on its website as "The Leading Innovator And Manufacturer Of Cryotherapy Applications."

46. One of Cryo Science's cryotherapy products is named the Glacier.

47. According to Cryo Science, its Glacier is the "[o]nly single person electric cryotherapy chamber capable of achieving treatment temperatures as low as -140°C/-220°F."

48. The Glacier was advertised as "[a] state-of-the-art cooling system and proprietary design" guaranteeing the most advanced device in the "Whole Body Cryotherapy (WBC) industry."

49. According to Cryo Science, the Glacier is "designed to be a perfect fit for high-traffic locations."

50. Cryo Science claims that the Glacier "is the best cryotherapy machine available on the market," after "several years of extensive research and development by Cryo Science's "top-end engineers."

51. Based upon Cryo Science's claims, M. Performance decided to purchase and install a Glacier machine to provide its customers with cryotherapy.

*Pre-Opening Problems With The Glacier*

52. M. Performance's Grand Opening was scheduled for August 2, 2025.

53. The initial installation of the Glacier began on or around July 1, 2025, and lasted weeks.

54. Upon final installation, there were immediate issues with the Glacier.

7

55.     M. Performance quickly noticed excessive noise and a rattle emanating from the Glacier.

56.     Despite the Glacier's Manual touting a noise level of between 70-76 dB, the Glacier reached levels that exceeded 95 dB, and was routinely between 85-95 dB.

57.     The excessive noise became nothing but a continual nuisance in the wellness center, and M. Performance initiated, at its own expense, soundproofing measures to deaden the noise.

58.     Once contacted, on July 15, 2025, Cryo Science diagnosed the problem as faulty fan bearings, and the bearings had to be replaced.

*Problems Continue On Opening Day And Beyond*

59.     While the bearings were fixed, during M. Performance's grand opening, Cryo Science diagnosed the machine as having a faulty fan assembly, and a new fan had to be ordered.

60.     On August 5, 2025, the Glacier was not shutting down as scheduled, nor was the door to the Glacier properly opening upon starting up.

61.     It seemed nearly every day there were problems with the Glacier, just a few of which are detailed in the paragraphs below.

62.     On August 5, 2025, the Glacier would not start up correctly. The same problem presented itself on August 12, 2025, notwithstanding that the Glacier was purportedly a brand new machine.

63.     On August 19th, the Glacier suffered a major circuit error, whereby the interior temperature reading was a negative 236° F, while the actual interior of the chamber was not cold at all. While this problem persisted, the Glacier's fan stopped working.

64. As a result of the continuing fan issues, M. Performance was advised that Cryo Science had to order a custom fan to replace the existing fan on the newly purchased Glacier, notwithstanding that Cryo Science was the supposed manufacturer of the machine.

65. On September 2, 2025, the Glacier again shut down, its fan again stopped working, the chamber would not cool properly, and another large circuit error occurred.

66. On September 9, 2025, the Glacier once again stopped working, and when it did work, the door would not shut correctly.

67. A technician, either from Cryo Science or engaged by Cryo Science came to M. Performance on September 22, 2025, to replace the fan. However, on September 23rd, the technician had to return to recalibrate the newly installed fan.

68. Later in the process, Cryo Science blamed this same technician for improperly installing the fan which caused subsequent fan issues in the future.

69. That same day, the Glacier's door was again not operating properly, and additional air-flow issues caused problems with the machine.

70. On September 30, 2025, the fan again caused problems with the air flow inside of the chamber.

71. These and other issues continued almost daily.

72. On October 7, 2025, the Glacier once again stopped working properly and shut down.

73. On October 14, 2025, the Glacier was not operating, apparently because of issues involving the gases used by the machine. M. Performance was unable to source gases to resolve the problem.

74.    Because of the on-going problems with the Glacier, a Cryo Science technician was scheduled to be on-site on October 22, 2025, meaning the Glacier sat dormant for an entire week.

75.    Unfortunately, the Cryo Science technician did not show up to M. Performance on October 22, 2025, and, because new gases could not be sourced, the Glacier remained inoperable.

76.    When M. Performance vigorously complained about the no-show technician, Cryo Science scheduled a technician to be on-site on November 11, 2025, meaning M. Performance suffered several more weeks with an inoperable Glacier.

77.    On November 11, 2025, the Cryo Science technician arrived at M. Performance and, because there were so many issues with the Glacier, remained on-site for a total of four (4) days.

78.    Notwithstanding a four-day visit by the Cryo Science technician, on November 18th, the Glacier was not cooling efficiently, taking over five (5) hours to reach its desired cooling temperature, which necessitated numerous on-line conversations between M. Performance and Cryo Science's technicians.

79.    On December 9, 2025, the Glacier's automatic door once again stopped working correctly, and on December 10th, the door had to be recalibrated by Cryo Science.

80.    On January 6, 2026, the Glacier once again broke down and stopped working. The Glacier's shutdown necessitated a Cryo Science technician to once again return to M. Performance on January 13, 2026.

81.    Because of on-going problems with the Glacier, a Cryo Science engineer was once again at M. Performance from January 17-21, dealing with the machine's low pressure, adjusting the gases used in the Glacier, replacing the Glacier's faulty fan, replacing a sensor, and adjusting the machine's door due to a broken magnet.

82. Although the Glacier was up and running on January 21st, after four days of being serviced, the machine went down again on January 24, 2026.

83. And, while the Glacier was once again nursed to health, it went down again during the first week of February 2026.

84. The issues identified above only tell a small part of all of the problems with the Glacier, as well as Cryo Science's inability to solve them.

85. While the Glacier was purportedly a new machine, upon its installation it was a machine that needed new fans, new gasses and a smorgasbord of other repairs and adjustments to keep it running.

*M. Performance Considers Closing Its Doors*

86. Because of the continued problems with, and inoperability of, the Glacier, M. Performance, a newly opened business, lost the ability to attract new customers, and lost existing ones.

87. At facilities such as M. Performance, the star attraction is the Cryo machine, yet M. Performance was without its star at least 40-45% of the time.

88. As a result, M. Performance needed to make a business decision: whether to close its doors due to its inability to keep current customers, or attract new ones, or to go in another direction to try and save the business.

89. M. Performance decided on the latter course of action, uninstalled the failed Glacier machine, and purchased a new machine from a different manufacturer in order to keep its doors open.

*Notice To Cryo Science*

90.     Following installation of the Glacier, it became immediately clear that the machine was not operating properly.

91.     As early as July 25, 2025, before M. Performance opened its doors to the public, M. Performance wrote to Cryo Science, asking that a technician be sent to the business, "to have this [the Glacier] up working and installed."

92.     Despite promises by Cryo Science that a technician would be at M. Performance on July 30, 2025, to correct issues with the Glacier, on July 29th M. Performance was advised by Cryo Science that the technician may not be there at all due to Cryo Science's failure to pay its technician.

93.     Upon information and belief, the third-party technician demanded payment in advance, for reasons unknown to M. Performance, but he refused to come to M. Performance without payment by Cryo Science in advance.

94.     Starting sometime on or before July 29, 2025, and lasting into early 2026, through a series of text messages and emails, M. Performance gave continual notice to Cryo Science of a number of issues with the Glacier that prevented it from operating correctly, or operating at all.

95.     These text messages and emails were responded to by Cryo Science.

96.     Even though the Glacier was purportedly a brand new machine, on August 7, 2025, due to numerous problems with the Glacier, M. Performance wrote to Cryo Science, "Guys I'm going to shut this machine down.  Please let me know what the plan is for fan assembly."

97.     Cryo Science responded, "Hello Todd, we ordered all the components for the new fan assembly…After we receive the part we will dispatch them directly to your site…and arrange a technician to replace the whole assembly and test it."

12

98.   M. Performance wrote back, "Oskar – how in the world are we expected to run a business with a machine that doesn't operate."

99.   On October 14 and 21, 2025, M. Performance provided notice to Cryo Science, the seller of the Glacier, of the machine's defects and Cryo Science's breach of the various warranties under Florida law.

100.   All pre-suit notices and conditions precedent have been satisfied and/or waived.

101.   M. Performance has hired Timothy W. Schulz, P.A. to represent it in this case, and has agreed to pay the firm a reasonable fee for its services.

### COUNT I
(Breach of Express Warranty)

102.   M. Performance realleges, and incorporates herein by reference, all allegations contained in paragraphs 1-101 as if fully set forth herein.

103.   As part of its User Manual provided to M. Performance for the Glacier, Cryo Science included a "Warranty Card," a copy of which is attached hereto as Exhibit "A."

104.   According to the Warranty Card, "[t]he quality and functionality of the product are guaranteed under this warranty."

105.   The Warranty Card also provides that "[t]he warranty is granted for a period of 24 months from the date of delivery of the device."

106.   The Warranty Card states that during the warranty period, "the defects resulting from the fault of the Manufacturer will be removed free of charge…," and that the warranty covers unsuitable materials or faulty workmanship.

107.   From the very beginning of the Glacier's installation at M. Performance, there were unsuitable materials and/or faulty workmanship.

108.   The fan bearings, fan and fan assembly needed replacement on multiple occasions.

13

109.   The sensors inside the Glacier were not working properly and needed replacement.

110.   The Glacier's automatic door was not operating properly.

111.   There were problems with the gases that were used in the operation of the Glacier, and such gases needed replacement and adjustment on multiple occasions.

112.   Despite the express warranty in the Warranty Card, Cryo Science did not guarantee the quality and functionality of the Glacier by either replacing the machine or taking it back and providing a full refund to M. Performance.

113.   At one point, Cryo Science did offer to replace the Glacier with a lesser machine (the nitrogen based Arctic) and/or the e-Arctic, an electrical version, neither of which was supposedly as good as the Glacier, and both of which cost less.

114.   Most importantly, Cryo Science never offered to replace the faulty Glacier it had sold to M. Performance with a new replacement Glacier.

115.   Despite months of inoperability, Cryo Science was never able to fix the continual problems with the Glacier.

116.   Cryo Science breached the express written warranty by failing, after repeated notice and opportunities, to remove the covered defects free of charge within a reasonable time, and its repeated unsuccessful repair attempts caused the limited repair remedy to fail of its essential purpose.

117.   Because of Cryo Science's breach of its express warranty, M. Performance has been damaged by having to uninstall the Glacier and replace it with a new machine from a different manufacturer.

118.   As a direct and proximate result of Cryo Science's breach of the express warranty M. Performance has suffered damages, including, but not limited to, the purchase price and related

14

costs of the Glacier, costs associated with attempting to address the Glacier's defects, removal and replacement costs, lost business revenue, lost customers, and other incidental and consequential damages.

WHEREFORE, M. Performance demands judgment in its favor on Count I, and against the Defendant, and seeks an award of all allowable and permissible damages, pre and post-judgment interest on any amounts awarded, and its reasonable attorney's fees if permitted.

## COUNT II
(Breach of Express Warranty by Affirmation – Fla. Stat. § 672.313)

119. M. Performance realleges, and incorporates herein by reference, all allegations contained in paragraphs 1-87 as if fully set forth herein.

120. Prior to purchasing the Glacier from Cryo Science, M. Performance researched and reached out to several manufacturers of cryo-machines.

121. Cryo Science claims in its online presence that the Glacier "is the best cryotherapy machine available on the market," after "several years of extensive research and development by Cryo Science's "top-end engineers."

122. When discussing the Glacier with a representative of Cryo Science, M. Performance was told that the Glacier was the only single-person electric cryotherapy chamber capable of achieving treatment temperatures as low as -140°C/-220°F, designed for high-traffic locations, a represented noise level of 70–76 dB, and specific operational/cooling representations.

123. M. Performance relied on both Cryo Science's on-line statements about the Glacier, and the representative's statements about the machine, in hopes of having a machine that would set it apart from its geographical competitors.

15

124.    Instead, the Glacier was unable to meet such expectations, out of service for 40-50% of its post-installation existence for a myriad of reasons, and oftentimes not cooling at all due to faulty sensors and problems with the machine's gases.

125.    As a direct and proximate result of Cryo Science's breach of its express warranty by affirmation, M. Performance has suffered damages, including, but not limited to, the purchase price and related costs of the Glacier, costs associated with attempting to address the Glacier's defects, removal and replacement costs, lost business revenue, lost customers, and other incidental and consequential damages.

WHEREFORE, M. Performance demands judgment in its favor on Count II, and against the Defendant, and seeks an award of all allowable and permissible damages, pre and post-judgment interest on any amounts awarded, and its reasonable attorney's fees.

### COUNT III
(Breach of Implied Warranty of Merchantability – Fla. Stat. § 672.314)

126.    M. Performance realleges, and incorporates herein by reference, all allegations contained in paragraphs 1-87 as if fully set forth herein.

127.    The Glacier was not fit for the ordinary purpose for which cryotherapy chambers are used, did not pass without objection in the trade, was not of fair average quality, and did not conform to promises or affirmations on its labeling/manual/marketing.

128.    Cryo Science touted its Glacier as "[a] state-of-the-art cooling system and proprietary design" guaranteeing the most advanced device in the "Whole Body Cryotherapy (WBC) industry."

129.    The machine's repeated inability to cool, unsafe/unreliable door function, fan failures, sensor failures, and 40–45% downtime reveal that the Glacier was not fit for the ordinary purpose for which cryotherapy chambers are used.

16

130.    The Glacier was purportedly designed to provide a minimum level of cryo-therapy, meaning exposing the body to sub-zero temperatures of up to -220°F.

131.    Not only did the Glacier fail to achieve such a level of cooling, the machine itself was never even operational 40-45% of its lifetime.

132.    At its best, the Glacier failed to provide even a minimum level of quality for which it was supposedly designed.

133.    The Glacier does not pass without objection in the cryotherapy industry under the description provided to it by Cryo Science.

134.    The Glacier did not conform according to the promises or affirmations of fact in both Cryo Science's website and/or the machine's operational materials.

135.    As a direct and proximate result of Cryo Science's breach of the implied warranty of merchantability, M. Performance has suffered damages, including, but not limited to, the purchase price and related costs of the Glacier, costs associated with attempting to address the Glacier's defects, removal and replacement costs, lost business revenue, lost customers, and other incidental and consequential damages.

WHEREFORE, M. Performance demands judgment in its favor on Count III, and against the Defendant, and seeks an award of all allowable and permissible damages, pre and post-judgment interest on any amounts awarded, and its reasonable attorney's fees.

## COUNT IV
(Breach of Implied Warranty of Fitness For Particular Purpose – Fla. Stat. § 672.315)

136.    At the time M. Performance purchased the Glacier from Cryo Science, Cryo Science knew, or had reason to know, that M. Performance was purchasing the Glacier for the particular purpose of operating a high-quality cryotherapy chamber as a central service offering in its newly opened wellness, performance, and recovery business.

17

137. Cryo Science further knew, or had reason to know, that M. Performance required a cryotherapy machine that could reliably and consistently operate in a commercial wellness facility, cool to the represented cryotherapy temperatures, safely accommodate customers, and withstand regular customer use.

138. M. Performance relied upon Cryo Science's skill, judgment, representations, and expertise in selecting and furnishing a cryotherapy machine suitable for M. Performance's particular business purpose.

139. Cryo Science impliedly warranted that the Glacier was fit for M. Performance's particular purpose.

140. The Glacier was not fit for that particular purpose. From the time of installation, the Glacier suffered from repeated and continuing defects, including, but not limited to, fan failures, faulty fan bearings, sensor issues, cooling problems, air-flow problems, automatic door problems, excessive noise, gas-related issues, and repeated periods of inoperability.

141. As a result, the Glacier could not reliably provide the cryotherapy services for which M. Performance purchased it and was inoperable for a substantial portion of its post-installation use.

142. Cryo Science was given notice of the Glacier's defects and the breach of warranty, but failed to cure the defects within a reasonable time.

143. As a direct and proximate result of Cryo Science's breach of the implied warranty of fitness for a particular purpose, M. Performance has suffered damages, including, but not limited to, the purchase price and related costs of the Glacier, costs associated with attempting to address the Glacier's defects, removal and replacement costs, lost business revenue, lost customers, and other incidental and consequential damages.

WHEREFORE, M. Performance demands judgment in its favor on Count IV, and against the Defendant, and seeks an award of all allowable and permissible damages, pre and post-judgment interest on any amounts awarded, and its reasonable attorney's fees.

Respectfully Submitted,

TIMOTHY W. SCHULZ, P.A.
Attorney for Plaintiff
330 Clematis Street, Suite 116
West Palm Beach, Florida 33401
Telephone:   561-659-1167
Facsimile:   561-659-1168
E-Mail: *schulzt@twslegal.com*

By: /s/ Timothy W. Schulz
      TIMOTHY W. SCHULZ
      Florida Bar No. 073024

19